UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARIA M. RIVERA,
                              Plaintiff

                                                                DECISION AND ORDER

-vs-
                                                               09-CV-6108 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____

APPEARANCES

For the Plaintiff:              Maria M. Rivera, *Pro se*
                                        38 Linnea Lane
                                        North Chili, NY 14514

For the Defendant:           John J. Field, Esq.
                                        Assistant United States Attorney
                                        100 State Street
                                        Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied plaintiff Maria Rivera's ("Plaintiff") application for supplemental security income ("SSI") benefits. Now before the Court is Defendant's motion [#11] for judgment on the pleadings. For the reasons that follow, Defendant's application is denied, and this matter is remanded for further administrative proceedings.

1

PROCEDURAL HISTORY

On or about November 30, 2004, Plaintiff applied for SSI benefits, claiming to be disabled due to high cholesterol, high blood pressure, depression, asthma, and difficulty concentrating. (137). [1] The Commissioner denied the application. On August 26, 2008, a hearing was held before Administrative Law Judge Marilyn Zahm ("ALJ"). Plaintiff appeared at the hearing with her attorney. On September 5, 2008, the ALJ issued a decision denying benefits. (14-25). On January 9, 2009, the Appeals Council denied Plaintiff's request for review. (2-4). On March 4, 2009, Plaintiff commenced the subject action, proceeding *pro se*. Subsequently, Defendant filed the subject motion for judgment on the pleadings. On December 1, 2009, the Court issued a Motion Scheduling Order [#12], directing, *inter alia*, that Plaintiff file and serve a response on or before January 15, 2010. To date, Plaintiff has not served a response.

VOCATIONAL HISTORY

Plaintiff was forty-nine years of age at the time of the hearing, and had completed the eleventh grade of high school, in Puerto Rico. (521-523). Plaintiff's last employment was nineteen years prior to the hearing, when she worked in a clothing factory. (523). Plaintiff stated that she did not remember looking for employment since that time. (*Id.*).

At the administrative hearing , Plaintiff stated the she spends her days watching television. She testified that she starts to perform chores, but never finishes them. (524). Plaintiff stated that she feels sad and desperate every day. (*Id.*). Plaintiff

---

[1]Unless otherwise noted, citations are to the Administrative Record.

2

indicated that she experiences physical pain when she performs chores or when she walks longer than ten minutes. (525, 531-532). Plaintiff maintained that she cannot sit longer than five minutes without having pain. (533). Plaintiff stated that she can lift less than five pounds. (534). Plaintiff also indicated that she hears voices everyday. (538). Plaintiff has been convicted, and has served nine months in jail, for petit larceny. (529-531). Plaintiff admits that she shoplifted to get money to buy illegal drugs. Plaintiff testified that she had not used marijuana for two years, and had not used crack cocaine for approximately 18 months. (527). However, as discussed further below, Plaintiff used marijuana and crack cocaine as late as September 2007, ten months prior to the hearing.

At the administrative hearing, the ALJ took testimony from Peter Manzi, a vocational expert ("the VE"). The ALJ first asked the VE to assume a person who could perform medium work, "simple work, no production rated jobs, occasional contact with others." (541). The VE stated that such a person could perform the following jobs: "laundry worker II, 361685018, medium, unskilled" (*Id*.); and "cleaner, furniture, 709687014, medium, unskilled." (542). Next, the ALJ asked to VE to consider that the hypothetical claimant also could not speak English, and the VE stated that such a person could still perform the jobs of laundry worker and furniture cleaner. (*Id*.). Moreover, the VE indicated that such a person could perform light jobs, such as cleaner/housekeeper and cafeteria attendant. (542-543). The VE further stated that none of the jobs that he identified involved constant exposure to respiratory irritants. (543).

## MEDICAL EVIDENCE

Plaintiff's medical history was summarized in Defendant's brief, and need not be repeated here. It is sufficient for purposes of this Decision and Order to note the following facts. Plaintiff takes various medications, including Wellbutrin and Paxil for depression, Lipitor for high cholesterol, albuterol for asthma, and lisinopril for hypertension. (142, 144). Plaintiff's medical providers include Tariq Abokamil, M.D. ("Abokamil"), psychiatrist Patricia Pielnik, M.D. ("Pielnik"), and Felix Marquez ("Marquez"), a social worker employed at Pielnik's office.

On July 21, 2003, Pielnik indicated that she had been contacted by Plaintiff's attorney, "requesting possible change" in a report prepared by Marquez, since "it was not supportive of disability." (345).

On March 16, 2005, Plaintiff was examined by John Schwab, D.O. ("Schwab"), an non-treating, examining consultative doctor. Schwab diagnosed Plaintiff with Type 2 diabetes mellitus, asthma, and depression. (204). Schwab's prognosis was fair, and he opined that Plaintiff had no physical work restrictions, except that she should avoid "any activity which triggers her asthma." (205).

On March 16, 2005, John Thomassen, Ph.D. ("Thomassen"), performed a psychiatric evaluation. Thomassen was a non-treating independent examiner. Thomassen found that Plaintiff's affect was anxious, and her cognitive functioning was "in the borderline to mild range of mental retardation." (214). Thomassen stated that Plaintiff's insight and judgment were questionable, and that her attention, concentration, and memory, were impaired. (*Id*.). Thomassen diagnosed Plaintiff with cognitive disorder not otherwise specified, alcohol dependence in full remission, cocaine

4

dependence in full remission, and "major depression, single-episode, moderate." (215).
Thomassen stated that Plaintiff had significant symptoms of depression, some cognitive limitations, and a history of substance dependence. (*Id*.). Thomassen's prognosis was "guarded given [Plainitff's] ongoing symptoms despite ongoing appropriate treatment." (*Id*.). With regard to Plaintiff's ability to work, Thomassen wrote:

> Ms. Rivera should be able to perform rote tasks and follow simple directions, but is likely to have difficulties doing any complex tasks. She is likely to have problems relating with co-workers and coping with stress. *Allegations of psychiatric disability appear consistent with examination findings*.

(214) (emphasis added).

On May 9, 2005, Pielnik performed a psychiatric evaluation. (361-365). Pielnik noted that Plaintiff had been under her care since December 2000. (361). Plaintiff complained of having "flashbacks" concerning "abuse" that occurred during her life. (362). Plaintiff stated that she was abused physically and emotionally by her grandparents and by the father of her children. Plaintiff reported having three daughters, and that she lived with the two youngest, who were fourteen and fifteen years of age, respectively. Plaintiff stated that until recently, she had also taken care of a granddaughter, who is the child of her oldest daughter, age twenty-six. Plaintiff stated that she was sad because she was no longer caring for her granddaughter. Plaintiff's mood and affect were depressed. (364). Plaintiff reported having auditory and visual hallucinations. Plaintiff stated that she wanted to die, but that she would not kill herself. (*Id*.). Pielnik indicated that Plaintiff's intellectual functioning was "in the average range," her judgment was fair, and her insight was good. Pielnik's diagnosis was

5

"MajDepress, Recur, Psyc," [sic] and "Postraumatic Stress Disorder." (364).

On June 2, 2005, Madan Mohan, Ph.D. ("Mohan"), a non-treating, non-examining agency review physician, completed a Mental Residual Functional Capacity ("RFC") Assessment. (230-232). Mohan indicated that Plaintiff would have moderate limitations with regard to remembering and carrying out detailed instructions, maintaining attention and concentration, working with others, interacting with the public, maintaining socially appropriate behavior, and completing a normal workday and workweek without interruptions from psychologically-based symptoms. (231).

In December 2005, Marquez completed an evaluation, apparently at the request of Plaintiff's then-attorney. (Exhibit 10F). Notably, although Plaintiff's then-attorney referred to the report as being from Marquez, the report is signed by both Marquez and Pielnik. (367). Consequently, the Court will refer to Pielnik as the author of the report. Pielnik indicated that Plaintiff's diagnosis was major depressive disorder with psychotic features, psychotic disorder, and post-traumatic stress disorder. (370). Pielnik indicated that Plaintiff had attempted suicide "years ago" while living in Puerto Rico, and that Plaintiff also had an in-patient psychiatrict hospitalization lasting two weeks, during which time she was suicidal. (372). Pielnik stated that Plaintiff had "ups and downs," but was "able to cope with depressive/anxiety symptoms." (370). However, Pielnik stated that Plaintiff's condition caused "extreme" impairments with regard to activities of daily living. (371) ("Depressed mood, tiredness, suicidal thoughts, sadness; all these symptoms will prevent the pt. [patient] from functioning at a normal level."). Pielnik further indicated that Plaintiff would have "extreme" limitations with regard to social functioning. (*Id.*) ("The pt. prefers to insulate self; afraid of crowds, becomes agitated

6

and loud."). Pielnik reported that Plaintiff's condition would result in deficiencies of concentration, persistence, or pace. (*Id*.). When asked to assess Plaintiff's ability to make "occupational adjustments," Pielnik stated that Plaintiff would have "poor or no" ability to follow work rules, relate with co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, and understand and carry out job instructions." (372, 373). However, Pielnik also stated that since Plaintiff had no work experience, it was difficult to say how she would perform in a work setting. (368). Pielnik stated that Plaintiff had the ability to manage funds. (367). Pielnik also stated that Plaintiff would have "poor or no" ability to maintain her personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability." (374).

On September 5, 2007, Plaintiff was hospitalized, after she allegedly became suicidal. (496-498). Plaintiff was reportedly upset, because she was afraid that she would be sent to jail for violating the conditions of her probation. (496). In that regard, Plaintiff stated that she was arrested for shoplifting, which she did to support her cocaine habit. (497). Plaintiff admitted to using crack cocaine, and her toxicology screen was also positive for cannabis use. (496). Plaintiff claimed to hear voices telling her to kill herself. (*Id*). Upon examination, Plaintiff's affect was tearful, but she was alert and oriented, her thoughts were logical and goal-directed, and her memory was fair. (*Id*.). Plaintiff's judgment and insight were impaired. (*Id*.). However, upon discharge from the hospital, Plaintiff's mood was good, and her affect was "full and appropriate." (497). Plaintiff's insight and judgment were improved, and she denied any suicidal ideation or hallucinations. (*Id*.). Plaintiff's diagnosis at discharge was "major depressive

7

disorder with psychotic features" and "crack cocaine dependence." (*Id*.).

On September 12, 2007, Pielnik made a file entry, discussing the fact that Plaintiff's recent hospitalization was purportedly because she was having increased depression and suicidal ideation. Pielnik stated, though, that it was later discovered that Plaintiff actually "was hoping to have provide excuse for his missing a DSS/CPS?[2] appointment/obligation." (413). Pielnik indicated that she would only prescribe Plaintiff with a few day's worth of medication, until Plaintiff could come in and see her. (*Id*.). However, Plaintiff failed to appear for a follow-up appointment a few days later. (414). The same entry, dated September 14, 2007, noted a concern that Plaintiff's "hospitalization was means to avoid probation obligation." (*Id*.). On September 19, 2007, Plaintiff also failed to appear for an appointment with Pielnik. (415).

On October 18, 2007, Pielnik completed another evaluation. (417-419). Pielnik noted that Plaintiff had just been "arrested again" and released from jail. Pielnik indicated that Plaintiff "changed her story several times" regarding the reason for the arrest. Pielnik also expressed concern upon learning that Plaintiff had been drinking alcohol for several years, and had begun using crack cocaine. (417) ("I shared my main concern that she has been drinking ETOH and it likely is contributory to many of the problems she is experiencing now – legal, poor mental health, psych hospitalization, probation for 1 year. Maria admitted that she does have a substance problem, which now includes crack as well as ETOH."). Upon examination, Pielnik reported that Plaintiff's thoughts were logical, with no psychosis or suicidal ideation. (*Id*.). Plaintiff

---

[2]The Court interprets this to mean "Department of Social Services/Child Protective Services."

apparently stopped treating with Pielnik when she was sentenced to jail in November 2007. (539).

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above,

the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such

11

> as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a). The regulation further states, in pertinent part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments:

"depression, post-traumatic stress syndrome, substance abuse, and asthma." (16). At the third step of the analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. At the fourth step of the analysis, the ALJ found that Plaintiff had no relevant past work. (24). The ALJ found further found that Plaintiff had the following RFC: "[F]ull range of work at all exertional levels but with the following exertional limitations: Spanish speaking; simple work; no production rated jobs; occasional contact with others and no constant exposure to respiratory irritants." (18). At the fifth step of the sequential analysis, based on the testimony of the VE, the ALJ determined that Plaintiff "would be able to perform the requirements of representative occupations such as a laundry worker II, medium level of exertion, unskilled[,] of which there are 42,861 jobs in the U.S. National Economy and 170 jobs in the Finger Lakes Region and as a cleaner, furniture, of which there are 490,000 jobs in the U.S. National Economy and 1,060 jobs in the Finger Lakes Region." (24-25).

In deciding upon Plaintiff's RFC, the ALJ gave "no weight" to the December 2005 report by Pielnik and Marquez, apparently because she did not consider the report to have been authored by Pielnik. (23) ("When treated in the hospital for her cocaine dependence, and provided with psychiatric medications, her symptoms were essentially eliminated. The [ALJ] gives no weight to the report of therapist, Felix [Marquez-]Drew[5] of February 2005 for this reason and for the reason that he is not a doctor. In addition,

---

[5]Marquez signed the reports as "Felix Marquez," however Plaintiff's attorney referred to Marquez as "Felix Marquez-Drew." (366).

his evaluation is at odds with Dr. Pielnik's assessment of a few months before that, which estimated the claimant's GAF as 75 (transient symptoms)." (23). On the other hand, the ALJ purportedly gave "great weight to the evaluations of the consultative examiner [Thomassen] and the review physician [Mohan]," finding them to be consistent with Pielnik's notes, Exhibit 12F. (20, 23).

## ANALYSIS

When Plaintiff appealed the ALJ's decision to the Appeals Council, she stated, "I disagree with the decision that the judge made. I have many medical problems and I don't think that I can work." (7). However, Plaintiff's complaint in this action does not identify any reason why the Commissioner's decision should be set aside. Moreover, Plaintiff did not respond to Defendant's motion for judgment on the pleadings. Consequently, Plaintiff has not identified any particular deficiency with the ALJ's decision.

However, based on its own review of the record, the Court finds that the ALJ erred in determining Plaintiff's RFC because she did not properly apply the treating physician rule. As discussed earlier, the ALJ gave "no weight" to Marquez's report, partly because Marquez is not a doctor, and partly because the report was purportedly "at odds with Dr. Pielnik's assessment of a few months before that, which estimated the claimant's GAF as 75 (transient symptoms)."[6] (23). The ALJ did not mention that

---

[6]The ALJ indicated that Marquez's (Felix Marquez-Drew) report is dated "February 2005," however, it appears that she was referring to the report by Marquez and Pielnik from December 2005.

14

Marquez's report was also signed, and apparently adopted, by Dr. Pielnik.[7]  This Court has previously held that it was error for an ALJ to reject a report by a non-physician that is signed by a treating physician. *See, Keith v. Astrue*, 553 F.Supp.2d 291, 300 (W.D.N.Y. 2008) ("It was improper for the ALJ to discount office notes and reports signed by [Dr.] Nanavati as being merely the opinions of Kubrich [social worker].") (*citing Santiago v. Barnhart*, 441 F.Supp.2d 620, 628 (S.D.N.Y. 2006)).  Accordingly, the Court finds that it was error for the ALJ to reject the December 2005 report by Marquez and Pielnik. (Exhibit 10F, 366-374).  In so doing, the ALJ erroneously rejected the opinion of Pielnik, Plaintiff's treating psychiatrist.  Moreover, to the extent that Pielnik's December 2005 report is "at odds" with her other reports and opinions, as the ALJ stated, then the ALJ must attempt to reconcile the evidence.  In that regard, it may be necessary for the ALJ to develop the record further.

Furthermore, although the ALJ indicates that she gave "great weight" to Thomassen's opinion (23), such opinion painted a bleak picture of Plaintiff's prospects in the workplace.  In that regard, Thomassen appears to indicate that Plaintiff was unable to work. (214) ("Ms. Rivera should be able to perform rote tasks and follow simple directions, but is likely to have difficulties doing any complex tasks.  She is likely to have problems relating with co-workers and coping with stress. Allegations of psychiatric disability appear consistent with examination findings."); (*see also, id*. at 215: "Her prognosis for the future is guarded given her ongoing symptoms despite

---

[7]Defendant's Memo of Law in support of its Motion for Judgment on the Pleadings acknowledges that the December 2005 report "was co-signed by Dr. Pielnik."([#11-2] at 4).  Defendant contends that even if the Court views the report as being authored by Pielnik, the ALJ correctly disregarded the report because it lacked "supportive evidence." (*Id*. at 22).

ongoing and appropriate treatment. . . . She is likely to have difficulty managing her own funds due to attention, concentration, and memory problems."). On remand, the ALJ should review Thomassen's report along with the other medical evidence.

CONCLUSION

For the reasons discussed above, Defendant's motion [#11] is denied, and this matter is remanded for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
April 8, 2010

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge